May I please the Court, David Warrington on behalf of Jim Hodge and the Allied Companies. The District Court failed its gatekeeping duty. It failed to make a record of its Daubert inquiry, articulating the basis for admitting the government's expert testimony over the objection of the defendants. That error affected the entire trial. As I recall, the District Court listed its reasons in its order denying a new trial. Is that correct? That's correct, Your Honor. Why is that not sufficient? Because, as the cases we cited in our brief say, the temptation for post hoc rationalization is too great. And the purpose in the bio-remedy case for having a District Court make a record of its findings is to guide the parties throughout the process to know essentially what the rules of the game are before the game is played. And in this case, there was no such record made by the District Court. And following up on that, wasn't this procedure of using a sampling for want of a better term, wasn't that suggested by your clients? No, it wasn't, Your Honor. Well, who suggested it? The government then? I believe the government did suggest it. You believe? The arguments below, the government, their experts were the ones that decided that sampling was the appropriate way to do this. I had understood that your client wanted that because it was so burdensome to produce all of these documents and that your client was acceptable to using less than all of the documents for this loss calculation. I misunderstood Your Honor's question in the context of what was done below. There was an objection to how the sampling was done that Allied made. Yes, the burden Allied did object to the burden of the global scope of analyzing 112,000 or so loans that were at issue in this case. Isn't that part of the problem with your approximate cause argument? It seems like you're saying that I have to take each loan and say, well, John applied for a loan and they didn't investigate his employment and then he lost his job because he had this job where people lose it all the time or he's working for a company that fires everybody constantly or whatever. And, therefore, I should have known that and that caused the loss versus your analogy of John had a heart attack, he was working at a job he'd worked for 30 years, and regardless of whether we'd explored that or not, we wouldn't have known he was going to have a heart attack and that's why he defaulted. I mean, you're asking for this kind of intense scrutiny of each loan. Like, what caused the person to default? Was it something that could have been discovered by a proper review or is it just one of those things that happens? Somebody had a perfectly good job and then lost it for no reason we could have imagined, had a heart attack, whatever. Isn't that your argument? No, that's not an argument, Your Honor. I believe that kind of conflates two things. It conflates the sampling issue and the proximate cause issue. Our argument on causation is very specific, regardless of whether you take it from the entire universe of loans or you take it from the sample. The standard in the Fifth Circuit is United States against Miller, which requires proximate cause. The causation of the default has to be something that is factually and legally related to causing the default. Here, there's no evidence of that whatsoever on the record. Isn't that part of – if we were just talking about one loan, this was a lawsuit about one loan, then we would be investigating, you know, versus he had a 30-year job that he lost and nobody saw that coming. Here we've got, as you say, thousands and thousands of loans. So we have to look at it in a broader picture. And the broader picture that the government is saying is we know that when people aren't vetted, we're going to have a higher default rate. Maybe there's somebody who wasn't vetted. You could not vet me and I would still pay the loan. So I would be an example of I didn't cause anything unless something terrible happened in my life. But then somebody that was vetted, you might have still given them the loan, but a big percentage of those you wouldn't in that situation. So the point is I understand them to be making is the vetting matters and you all didn't do it. Why isn't that a fair argument? Well, there are a couple of responses to that. And the reason it's not a fair argument is the standard by which they measured Allied. It was an idiosyncratic standard by Mr. Payne. His whole analysis was about eligibility. And he found defects in the loans, missing paperwork, missing map page and loan appraisal. A lot of these defects didn't actually go to the ability of the borrower to repay the loan. And that's what all of the cases on this, Miller included, say, is required for liability under the causation under the approximate cause standard. A loan, a defect. Let me make this point, repeating this point just when you brief. You seem to make several times in your briefing the argument that Payne acknowledged he had this idiosyncratic approach, he didn't follow the regulations in determining what proper underwriting meant. But he did make this statement. Mr. Payne, did you and your team apply the FHA guidelines, including the ones we've been looking at today? Yes. Would that include the total scorecard guide? Yes. So there is evidence in here regardless of, I mean, you're relying on some things he did say as well. I'm not, didn't create this out of whole cloth. But he did assert that, yes, indeed, I follow just what the FHA says should be followed in deciding where the proper underwriting is going on. Why doesn't that support what happened? Well, first of all, factually, he used documents and guidance from non-FHA sources. There's a notice problem there. If you're going to be held to a standard, if you're dealing with taxes, you're going to look at the tax code. Okay, but what does this mean here? He said he followed those guidelines. And he may have considered some other things, but at least this expert was asserting that I applied what I was supposed to apply in deciding whether, and the same thing the FHA is requiring, whether that was met or not. Well, that's, that assertion has to be something, it has to go to a standard of care. It has to go to something that's an industry-recognized standard. There's, the Court's at a disadvantage here because it has no record of the District Court's Daubert inquiry. Is this problem, the Carlson problem, with not having detailed the Daubert analysis, that we don't really know exactly what the District Court found on Payne's standard of care? Because he certainly could have considered the HUD guidelines but also added a bunch of his own stuff, and that would implicate your argument. Or he could have looked at his bunch of stuff but only followed the HUD guidelines in his determination of dollars, and that would be consistent with the government's argument and be a different approach. So is that the sort of substance of the Carlson problem? That's correct, Your Honor. And you can also look at Mr. Payne's testimony with regard to whether this is a standard that's applicable in the industry. He did testify that he didn't look at any other application broader in the mortgage industry. This was his standard. It was a standard that he came up with. He came up with it for the purposes of this litigation. So if you're looking at behavior by this company from 2000 to— It's not just two ships passing in the night on that point. I mean, the government says, oh, he applied the right standard. It was not just a made-up thing. You say it's a made-up thing. It's a little hard to tell from the record, and that's why I'm asking if that's the Carlson problem, is that we needed the person on the spot, the district court, to really get into that and say, here's—what I would like to see is a comparison. Here's the HUD standard. Here's the Payne standard. I couldn't find that in your briefs. Maybe it's in the record somewhere. I'm not going to pretend I've read every single page of the record. And if it is, somebody point it out to me. So I'm just—I'm a little bit confused because I'm having trouble comparing the two to know, is it a semantical difference or is it a substantive difference between what Payne did and what the sort of objective standard of care should be? It's a substantive difference. And how do I find that? The court's at a disadvantage— Is it in those briefs? The court is at a disadvantage because it does not have the record from the district court, but we did extensively— No, I have the record from the district court. No, they don't have a record. I don't have the district court evaluating it, I agree, but I have the record from the district court. But what I don't have is y'all's briefs laying this out. I mean, you spend, what, is it 100 pages or something? It's a very long brief, both sides, that really doesn't say what it needs to say, which is here's what he should have done, here's what he did. That's your brief. Their brief should have been here's what he should have done, and here's what he did. He did what he should have done. That would have really helped. Your Honor, I can point you to the briefing on our Daubert briefing. Those were substantive motions. There were four Daubert motions. You mean in the district court? In the district court. We don't look at papers in the district court. You're supposed to do that again on appeal. Your Honor, and the court has already recognized it's at a disadvantage because it doesn't have the district court's analysis of that because there was no analysis in the record. I guess what I'm coming back to is it's not a mere technicality, the lack of a Carlson analysis. It also hurts our ability to reconcile these opposing positions, and that could make a difference. That's why. But, I mean, I think you might imagine we're loathe to retry this long trial on a technicality. I mean, if the law requires it, it requires it. I'm there. I'm fine on that. But it would be helpful if the technicality had substance in terms of looking at that. Well, Your Honor, and this point was made to the district court, that the mere technicality, if that's how it's characterized, it doesn't trump Mr. Hodgins and the company's right to a fair trial, and we would assert that that's because the district court did not do this Daubert analysis. I have to say they've admitted, in essence, to quite a bit of fraud. I mean, here's this guy who is hiding how these loans are really being vetted. He lies when they approach him on them and says, oh, that was just a one-off. And yet we're supposed to believe, well, Mr. Hodges is innocent, and all of this is just a bunch of goo that the district court failed to work through, and the jury also failed to work through. Well, there are a couple of issues with regard to the jury working through this, but let me get to the point of not every lie, misrepresentation, false statement arises to the level of a False Claims Act violation, and the reason for that is there are other remedies available to HUD. If, in fact, these things were false or the underwriting wasn't done properly or it was done negligently, that doesn't give rise to a False Claims Act violation, but you could have HUD come in. They were coming in, and as late as 2010, HUD's own inspectors found no patterns of behavior that were consistent for errors in the underwriting loans of Ally. Yet five years later, six years later, Mr. Payne comes up with this standard and decides that everything they did was wrong. The interesting thing about Mr. Payne's analysis is that he also said that HUD's total scorecard automated program got the underwriting decision wrong 50% of the time. So what standard is Ally being held to here? No loan is perfect. Underwriting decisions are completely subjective. Even Mr. Payne agreed to that. It's in HUD's guidance that underwriting is more art than science. HUD's own witnesses testified that if you put five underwriters in a room with five different loans, you'll get 25 different opinions. You're running out of time, so I want to ask about the jury, because this has me very concerned as a former trial judge about how this plays out. Now, we have the very brilliantly written opinion in Patel, which follows the decision in Ebron, so Patel being unpublished but Ebron being published. And I don't think we have rejected the no possibility rule. We've just not applied it. So I think it's still out there. But it seems like what these cases are saying is if there's an argument that can be made that the juror is not following the direction to deliberate with the other jurors, we're done. The judge has the call. It's in the trial judge's discretion. How do you get around that? Well, that's actually not what happened here. If you look at the jury deliberations, and even after the judge brought the jurors out and asked, the vast majority of the jurors, save one, I believe, said that everybody had participated in the deliberations. But the problem here is that it goes directly to juror note number four, and I believe that's record site 8318. When that note came out, it revealed a split in the jury and it revealed that the holdout that a juror was holding out for allied and Mr. Hodge. The district court knew that. He admonished the jury foreman for disclosing the contents of those deliberations. A few days later go by, essentially after the first Allen charge, temperatures rise. People get heated in their debates. There's a second Allen charge. There was a mistrial request after the first Allen charge, mistrial request after the second Allen charge. And the judge then decides he's going to remove this juror that's causing all the problems. He knew that that was the juror that was holding out for allied. Surprise, surprise. Shortly thereafter, you get a verdict for the government. So once the sanctity of the jury room has been invaded, when the district . . . But that's not the case in Evron and Patel. Correct. Once that's been invaded, the proper remedy for that is a mistrial. There was a cascade of errors in this case from the failure to make the Daubert analysis and make a record of that to the proximate cause versus but-for causation standard and then the tossing off the holdout juror. Justice requires that this be done again so that Mr. Hodge and his company . . . Circle back to the Daubert rulings, which the judge said, I want to do these during the proceeding. I don't want you to wait until right before trial. What, if any, objection was raised to the judge not stating findings for why he upheld this methodology? Well, according to the law, once we file the Daubert motions objecting to the testimony, that issue is preserved. But during the course of the testimony, there were issues that were objected to, and certainly on the motion for a trial . . . At the time that that was issued, none. Right. But you're saying you don't have to make it? No, because we've already made the objections to the ruling. No, sir. I said, what objection was made to the judge not making findings and conclusions? Did you make any? No, Your Honor. All right, counsel. We've got your answers. Thank you. Good morning, Your Honors. Assistant U.S. Attorney J.D. Barnea for the government. I'd like to start with some of the points that were addressed in the prior argument, but I'd first like to start by making the general point that this is a case where we're reviewing a jury verdict, and the jury heard sufficient evidence in support of all the government's claims and found them in favor of the government on all of the claims. And so I think that's an important guiding principle. Yeah, but the jury still has to be properly given evidence, properly, you know, dealt with. And so that's, you know, I'm very respectful of jury verdicts, but if the judge didn't do what he was supposed to do, then we have a problem. Absolutely, Your Honor. With regard, for example, to Mr. Payne's testimony, Mr. Payne testified that the standard he applied was the HUD standard, that if he consulted any outside sources, they were only those that were consistent with the HUD standard. HUD's witnesses testified that the documents that Mr. Payne relied on were the HUD standard. Allied's own underwriters testified that the same documents were constituted the standard that they knew that they were supposed to apply when they were reviewing the loans. And so any suggestion that the standard was improper or made up by Mr. Payne is essentially defense counsel using their cross-examination. The questions that they asked Mr. Payne that he responded to in the negative as evidence of some kind of improper standard that was used. So, Mr. Barnes, would a close look at the record show us that Payne acknowledged that he used some standards or techniques or whatever the labels were at the time that were independent of the FHA standards? Your Honor, the record shows, I believe, that he applied the HUD guidebooks that tell you how to underwrite an FHA loan. He consulted one additional source beyond that, and he specifically testified that he only used it to the extent it was consistent with the HUD standard. And I think an important point here is Mr. Payne made specific findings regarding several hundred loans here, and no one from the defense during their cross-examination, during their Daubert motion, or even on appeal has ever pointed out any finding by Mr. Payne regarding any loan that they disagree with, that they think that under whatever standard they think he should have applied would have come out any differently. So he may be discussing a theoretical disagreement, but I'm not even sure there's a theoretical disagreement here. Well, it sounds to me, unless they're creating this evidence, there certainly is a fair amount of testimony by Mr. Payne on which they can at least base the argument that he was using things beyond standards, guidance beyond the FHA. If we look at that, are we going to find that they're right, that it's not as frequent as they're saying? What will we find when we look at the testimony that they're talking about? You will find that Mr. Payne testified that he applied the HUD handbooks that you're supposed to apply when you— Don't take me back to your argument. Take me to what we're going to find that they are talking about now. Not why it's irrelevant or whatever, but what are we going to find that is the testimony that they're talking about? I believe they asked him about that he referred to one document that was not a HUD handbook and that he explained that his reliance on that document was limited to the extent that it was consistent with the HUD handbook. That's the sole exchange that I'm aware of. So that's all that I'm aware of. And, again, those are the HUD handbooks that he was supposed to be relying on. This is why a point-by-point would have been helpful. Here are the HUD standards. Here are the Payne standards. Somebody would win on that. Neither side wanted to do that. That worries me. And a hundred pages of briefing that somehow complies with our word limit. It was not addressed, so I feel like I'm a bit lost on this question of what exactly the standards are and what standards did Payne apply. Where can I look to get that answer since it's not in y'all's brief? Respectfully, Your Honor, I believe it is in our brief, and it's in Mr. Payne's testimony. He testified that he applied the HUD standard. No, no. I don't mean that. Okay, like, I applied the right standard, ladies and gentlemen. That doesn't tell me anything. The standard requires five things. One, two, three, four, five. I applied one this way, two this way.  Not just everybody look at me. I applied the standard. Well, Your Honor. Do you not understand that point? No, well, Your Honor, respectfully, the standard is the underwriting standards that HUD publishes in several handbooks, so it's not as simple as there are five points you have to look for. You have to look at, you know, how is the loan underwritten? Did they consider the borrower's income properly? Did they calculate the debt-to-income ratio properly? This looks like a list. And those are exactly what those HUD handbooks say how to do. I would say that I followed that, and if he doesn't tell me I looked at these 10, 20, 50 things, whatever it is, and then I would wonder if there's 50 things you look at as a good, so as the star-class underwriter, I'm going to look at 50 things, but this guy only looked at 49. Does that mean that that's a fraud that we should get an FCA huge dollar figure on? I mean, that's the problem. If we don't even know what they are, the list, and we don't have what pain applied and we don't have what allied messed up on, then we could have the situation where it's really just a typo-ish thing, maybe a fraudulent typo, but it's still a typo-ish thing, or we could have something that's very substantive, like you didn't bother to check. Somebody says my income's $80,000 a year, and they're actually making nothing, and you didn't check that. That sounds substantive. Well, Mr. Payne explained his findings. He went in detail at the trial through, I believe, two or three loan files and explained exactly what his findings were and explained exactly why the violations were serious and substantive, and he then entered into evidence a chart summarizing his conclusions with regard to the other 300 or so loans that went through issue by issue and problem by problem for each loan and said this loan. How does that relate to the HUD standard? It was applying exactly the HUD standard and nothing else, and I can give you the page number. Point me to the pages where I can get Payne's testimony matched up to the HUD standards. Well, Mr. Payne, his testimony where I believe it was two loans that he went through at trial was 14923 until 14952, and then the chart that was in the exhibit that was entered into evidence summarizing his conclusions for all the remaining loans is at 27528 through 27655. And so, again, this was entered into evidence. They had an opportunity to both get... And the HUD standards are... The HUD standards are in a bunch of guidelines that are cited in our brief, which I'm happy to give you the page numbers for them, but these are lengthy handbooks as opposed to... Well, I mean, that's why I appreciate the joy of reading the entire handbook, but I'm just trying to look for a summary of that. Right. Well, Mr. Payne earlier in his testimony summarized the basic principles of, you know, how to underwrite a loan properly, how to underwrite an FHA loan properly. The first HUD witness at the trial, Scott Bice, also summarized the general principles for how to underwrite a loan properly. You look at the borrower's income, assets. You evaluate the value of the property. You look at other debts that the person has. So these are all... This is all very much in the record. It was explained to the jury at length, and nothing that Mr. Payne did was inconsistent with that. And, in fact, the defendants never suggested as much in cross-examination or in any of their motions to the district court or in this court. Okay, so now let's take the proximate cause. Okay. As I said, you might fail to investigate somebody's income, but it turns out the person said they had $80,000 in income. You didn't investigate that, but they, in fact, had $80,000 in income. I would say, then, the lack of investigation of the income is not the proximate cause of what happened next. You know, the guy had a heart attack or whatever. I realize that's a bit of an extreme example, but I'm just trying to investigate the proximate cause point. So how do we make that link between had you investigated this guy, you would have found that while he says he has $80,000 in income, he really has $8,000 in income, and I think we can all see why that would be a problem, you know, if you're buying a house that's $200,000 or whatever the number is. Well, first of all, I think the first thing to remember is proximate cause is not a single cause, as the Supreme Court pointed out. I'm well aware of what proximate cause is. There are many proximate causes for every... You can have sole proximate cause, but you can't afford the one proximate cause. Nonetheless, I would argue in my first typo of I didn't investigate the guy's salary, but he is, in fact, making $80,000. There's zero proximate cause there because my failure to investigate caused nothing. He actually had the money. It turned out to be true. He told the truth. Imagine that. Right. Well, Your Honor, first of all, when you're underwriting a loan, you're determining sort of a kind of a... You're looking into the future, into an unknown future. So you're trying to figure out if the person, as they are now, are likely to be able to pay back their loans over the next 30 years. And so you're looking for things like do they have enough extra income so that if some unexpected thing, which inevitably will happen to most people over the 30-year course of a loan, that you're going to be able to be... But y'all are complaining about a failure to vet. And what I'm saying is it is possible that somebody fills out a loan application and tells the truth, and then I fail to vet it, but the truth would have supported the loan. And the vetting would have supported the statements in the document, and therefore my vetting didn't cause whatever happened later. Well, I believe failure to substantiate something that's truthfully presented may be a very small part of the findings. Most of the findings by Mr. Payne were somebody not having the correct loan-to-value ratio, not having sufficient income to be able to afford the loan, not having made a sufficient down payment, you know, the value of the house not being what it was supposed to be, you know, fraudulent or sort of, you know, not fraudulent, I'm sorry, like suspicious-looking documents in the file that suggest that something is, you know, going on. And so, you know, I suppose you could sort of tailor-make a hypothetical example, which is, of course, what we do in court here, to create an example where, yes, absolutely, the person was absolutely correct and the underwriting would have caught absolutely nothing, and yet, you know, you get hit by a bus the day after you sign the loan, but that's not what's happening in 99% of these cases. Right, but you kept making the argument that we just wouldn't have made a loan to an unlicensed or a group that doesn't have the right number. And it made me think about a car accident where somebody's driver's license was revoked, but they're driving a car anyway, and they, in fact, had the green light and the other guy had the red light and hit them. I don't think the fact that they lack a license, while that's wrong and I'm not in any way endorsing that, caused the accident. The accident was caused by the other guy who had a license running the red light. So this constant focus on, well, we just wouldn't have been here, you know, if my mother didn't give birth to me, I wouldn't have caused the car accident, so let's sue my mother, that's getting too far off proximate cause. Well, if we're talking about the unregistered branches, it's a slightly different causation argument, but it's still here. The jury heard evidence that the branches that were not registered, Mr. Hodge specifically decided which branches to register and which ones not to register. The ones he didn't register tended to be the ones that were less good at making loans and tended to make poorer loans. And in fact, he specifically, and there's evidence in the record, specifically directed that those branches who he didn't want to be subject to HUD scrutiny use other branches' numbers to make their loans. And then, surprise, surprise, several of those branches were in North Carolina, where there had been a statewide ban on them registering new branches until they could fix up their problems there. And a bunch of those branches actually had extremely high default rates. So this is not a random sampling of just, OK, you know, here you go, this branch is registered, this one isn't, they're making equal loans. We have evidence in the record, and the jury was entitled to find that there was a deliberateness in the unregistration of the bad branches. So I don't think we have a causation problem either on the underwriting or on the unregistered branches issue. What about the Carlson strict liability argument, the failure to have done an opinion on why Umet-Daubert is itself reversible as sort of a matter of strict liability? Well, Your Honor, I don't think that there's a strict liability standard under bioremedy. In fact, I think this court has applied... First of all, I'd like to say that I think that the... As to the sampling, the court's Daubert finding, Daubert analysis was done well earlier in discovery. Then we have the district court, you know, sort of reiterating and sort of elaborating on some of those points in the post-trial order. But even if all of that were an error, under Mathis v. Exxon, this court has applied a harmless error standard in which the court itself essentially evaluates the expert's qualifications and the expert's, you know... you know, the methodology that he used, and if it finds it sufficiently acceptable, like it did in the Mathis case, it can affirm on that basis. In fact, I believe in the Mathis case, the court had some questions about the expert's methodology and sort of suggested that it might have liked it done a little bit differently, but nevertheless said, well, that would have been something to address in cross-examination. That's not enough to overturn a jury verdict. And so it allowed the opinion to stand. I think in bioremedy, in contrast, we had this court looking at the expert who was kind of an unqualified person and giving a somewhat, you know, outlandish-sounding testimony, and this court basically concluded that there was no reason for that kind of testimony to be admitted in the first place, and it reversed for that reason. So I don't think we have a strict liability issue of if the district court doesn't write down, you know, to this court's satisfaction what its reason is, it has to reverse. What about the juror? You do see the problem here, that if the judge knows how that juror is voting and that that juror is the holdout to getting a verdict in a however-many-week trial, that's a problem that's different from simply the run-of-the-mill, if you will, juror that's being a... refusing to engage in the process. I think there's two issues with that characterization of what happened. First of all, though there is the one note that suggests that this juror had sort of a general view of the government is out to get everyone, there's no suggestion that there was any kind of holdout or any kind of deadlock in the sense that this juror was specifically holding out for one... He had two Allen charges. One, Your Honor. One? Okay. Sorry, I didn't mean to point like that, but there was only one Allen charge. I thought there was only one, but he said two, so then I thought I missed one. I underlined that. One Allen. There was one Allen charge. This juror may have expressed at some point some sort of general view that the government is out to get everybody and essentially refused to participate in the deliberation, and then he went on to threaten other jurors. But all of the jurors basically said, you know, he doesn't really want to engage with us on being persuaded the other way, and I feel like that's his right. I mean, if we had a criminal case where one juror walked in and said, I just don't think the government's proved their case. I'm voting not guilty. And they go, well, we want to talk and whatever. You know, look, I just don't think the government's proved their case. Would we say that juror must be taken off the panel? Well, first of all, Your Honor... That really worries me, because I think you are entitled, while you're supposed to sit there, and I agree you shouldn't threaten people, although I think it's questionable whether that happened here, I think the juror is entitled to make a decision based on the evidence and doesn't have to give in to the other jurors that all think he's guilty, or vice versa. They all think he's not guilty, and they think he's guilty. That is why you have holdouts. That's why Texas has the 10-2 in civil cases, so that there isn't one holdout or even two that can keep you from having a verdict. That's not our federal rule. Well, Your Honor, I think it's important to remember that, first of all, these were findings that were made by the district court as a trier of fact. It observed the demeanor of all the jurors when it called them in, so this is a pretty deferential, abusive discretion review here. But I think that there's a little bit of a bit of mischaracterization by the defendants about what happened, and if you read the record of the jury deliberations... I did read it. You will see that... And we don't have records of the deliberations. No, of course not. The hearings in open court. The record of deliberations would be quite interesting. Quite interesting. Your Honor, I think we have an issue here. For example, when the court gave the Allen charge, part of the Allen charge tells jurors in general, if a substantial majority of the other jurors disagree with you, you should be open to reconsidering your position and discussing it further with them. That is a specific instruction that this juror disobeyed, in addition to threatening the other jurors and wearing earplugs and glasses in the jury room and sleeping and snapping anyone trying to engage with him about any discussion. So this is not about, like, I'm voting here and you're voting there, and let's try to debate. This is about failure to even participate in the process, to even look at the evidence, to even consider whether or not... People are shouting at you. Can you not put on earplugs? I mean, that's what he said. That's what he said. People were shouting at him. Earplugs don't keep you from hearing. They just keep you from hearing as loudly. Well, the judge, the district court judge, found his testimony on that point to be not credible, and he found the testimony of the other jurors who said that he was the one threatening them to be credible. So again, this is the sort of determination that is maybe difficult to do on the cold record and the transcript may not do justice to. It just worries me for the future because I can see one juror getting bullied by the others, then he fights back by saying, you know, or else, and to me, I don't know why that's a threat, but fine, let's say it is, and now he gets struck, and lo and behold, we got ourselves a unanimous verdict. That's, um... And again, Your Honor, during the questioning... It worries them to me. During the questioning of the jurors, all the other jurors said that they had not even made up their minds yet at that point, and this was four days into the deliberation. So I don't think that... And why are they doing the, um... Why are they getting the Allen? It's not a hard hypothesis to make. These are exactly the kinds of juror misconduct that does get you thrown off a jury, and the district court followed this court's instructions. In fact, the process by which this was done was essentially directed by those decisions and guided by it. Let me take you to a different issue beyond probably the time you have left. In looking at the two figures of loss, $7.4 million, $85 million, what was necessary in Payne's testimony before a loan would be put into the list that added up to $7.4 million? $7.4 million. I'm not... That's the unregistered branches. Now, would that be any loan from where the line 13 was incorrect that defaulted? To what extent... And there was some testimony about an overlap between bad underwriting and the misstatement of which registered branch this came from. So I'm not trying to get into double-counting. But what was required? Just a default from an improperly designated originating branch? Yes, Your Honor. The underwriting claim obviously involved Mr. Payne's analysis... So were there any problems with underwriting not relevant to the $7.4 million? The unregistered branches, we simply looked at any unregistered branch that was not registered and that the loan defaulted. Okay. In the $80-plus million, what was necessary in Payne's testimony before a loan went into that total? He testified that he only put loans into that category if he found substantial, serious violations of objective HUD standards that were clearly apparent from the... Of the underwriting. Of the underwriting. And so there's no effort, getting to some of the exchanges earlier, no effort, whether Miller would require it or not, to get into the actual cause of a particular default in this sample. The expert testimony by Mr. Payne was not designed to establish causation. He was not asked that question. There is evidence of causation in the record. It was simply not expert testimony. Well, but people didn't look at however many loans were in this $85 million, $84 million and looked at that loan by loan as to why any particular one of those loans failed. Well, that, Your Honor, I don't believe is required, but... What I'm saying, but I'm asking for what happened. Correct. There was no loan-by-loan analysis to figure out, you know, if this person... Understood. ...is not making his payments because he lost a loan. I just want to be clear about some of the exchanges you were having earlier. None of that is in either one of these calculations or any one of these totals. Right. And we don't believe that Miller or any other case requires that kind of analysis. Anything else? I see that my time is up. Are there... If there are no more questions... I may have missed... Are you Mr. Torrance? No, I'm Mr. Barnea. That's what I thought. I think you were referred to... Mr. Torrance is back there. Right. I thought you had been called Mr. Torrance and I thought you were Mr. Barnea. All right. I must have missed it. Thank you. Thank you very much, Your Honor. Your Honor, just briefly, on the approximate cause issue to follow up on the questions that you just had with Mr. Barnea, the only evidence in the record regarding an actual cause of a default is found in the individual case summaries on the early payment default reviews. And you can see, and those are in our record excerpts, you can see examples where it says cause of default, death of borrower, cause of default, loss of job, cause of default, illness, cause of default, divorce. Those reasons are in the record. That's the government's evidence. They put those in the record. There's no other evidence that, regardless from Mr. Payne or anybody else, that any of the missing documents in a loan had anything to do with the borrower's ability... Your record excerpts have 25, 20 examples like that. Did you... Is that all that had some sort of explanation that would not be consistent with poor underwriting? In those early payment default reviews? Yes, Your Honor, but those are only a small subset. You only review, I believe, it's 5% of the early payment default or 10% of the early payment default, so there's necessarily going to be a smaller subset of those in the record. But that's the only evidence of anything where there's an actual cause tied to the default. Another point... Tied to poor underwriting, it's all divorce and death in one... It's all divorce, death, all manner of... It's been a rough time for everybody. And the other issue is we've been discussing Mr. Payne's standard. Mr. Payne's standard is eligibility, but the standard in this case is recklessness, and that's under the False Claims Act. If you're going to do this sort of painting with a broad brush in order to meet the scienter requirement, it has to be... Underwriting is done so recklessly that you knew or should have known that you were causing these problems. And nobody... There's not a jury instruction on recklessness, even though we asked for it. Recklessness isn't discussed. Everything's compared to Mr. Payne's analysis of eligibility. So whether a loan was eligible for FHA insurance or not is what he determined based on his standard. And I want to... Under the amended FCA, amended in 2009, materiality, on the other hand, is having a natural tendency to influence or be capable of influencing the payment or receipt of money or property. So where do you draw the line between the recklessness you're claiming, I suppose, for scienter and the materiality definition under the amended act? Well, under ESCOBAR, that's a demanding standard, and in order to show that, you have to show that it's not just merely something that the government deems as material. So, for instance, in the Box 13 on the 92900A forms, even if that number's false, one, it's not certified to by any certification in that form. It's specifically not in the certification that the loan correspondent signs. Secondly, those documents are reviewed for completeness. They're not reviewed for substance. That was the testimony of the HUD officials. They get these documents, make sure all the boxes are filled out, and then they put them in a file and they're never looked at again. If a loan had defaulted or had defaulted, HUD certainly could have picked that loan file up, looked at that branch ID number and said, hmm, that's a problem, that's not correct, we're going to deny the claim based on that  They didn't do that. They just paid the claim. So, clearly, Box 13 can't meet that materiality standard. So, under that analysis, under ESCOBAR, we would submit that the statements that the government's claim of material, and I see my time is up, Matt. Please finish your answer. That they can't meet that materiality standard under ESCOBAR. Thank you, Your Honors. All right, counsel. Thanks to both of you for helping us understand this case.